## STEWART *vs.* THE STATE OF GEORGIA.

1. The verdict is not contrary to law or the evidence.
2. That the names of jurors were not in the jury box or on the jury list, is not a good ground for new trial, when urged for the first time after verdict.
3. Though a charge may appear to be improper when abstracted from its context, yet if, when considered therewith, it is legal and proper, it is not a ground for new trial.
4. However gross may have been an affront or injury, yet if the injured party allowed some two months to elapse, during which he frequently met the aggressor, and then, without a repetition of the wrong, sought an opportunity and shot him, he could not be excused on the ground that he had not had time for reason to resume its sway.
5. Newly discovered evidence concerning a conversation in which the defendant himself engaged, is no ground for a new trial.

JACKSON, Justice, concurred *dubitante.*

Criminal law. Jury. Charge of Court. New Trial. Before Judge MERSHON. Glynn Superior Court. May Term, 1880.

Reported in the decision.

MABRY & CROVATT, for plaintiff in error.

S. W. HITCH, solicitor-general; SYMMES & ATKINSON; IRA E. SMITH, for the state.

SPEER, Justice.

At the May term, 1880, the accused, W. F. Stewart, was tried and convicted in Glynn superior court, of the offense of assault with intent to murder one W. F. McIver, alleged to have been committed in said county on the 10th of December, 1879.

Defendant was found guilty, and at same term a motion was made for a new trial on various grounds of error alleged to have been committed by the court, as are,

set forth in the record, and the same having been overruled by the court, error is assigned in this court on each, of said grounds.

The question is, did the presiding judge err in his judgment overruling said motion on the grounds therein contained ; for, unless we are satisfied error was committed by him, we have no authority in law to disturb this verdict or to arrest its consequences to the accused—whatever may be our sympathy for the unfortunate position in which he is placed.

Before entering upon a discussion of the legal questions involved in this record, it will aid that investigation to give a brief summary of the evidence in this case as found in the record.

It appears that in 1879 the accused, Stewart, and McIver —upon whom the alleged crime was committed—resided in Brunswick; that McIver was a nephew of the brother-in-law of Stewart, and having been well known to him from his early boyhood, was treated with the confidence and intimacy of a family connection.

It further appears, on the 10th of December, 1879, in Brunswick, while McIver was standing near Nelson's corner talking and laughing with three other friends, Stewart suddenly appeared in their midst, drew his pistol and opened fire on McIver ; that he shot at him four times, hitting him twice, the second and fourth shot, once in the side then in the neck, from which last shot McIver was knocked down and fell in the street bleeding and unconscious. The bystanders saw McIver have no pistol nor did he shoot. Such are the facts as testified to by the eyewitnesses present, and having proven these facts the state closed. The defendant introduced no evidence, but made "his statement," in substance as follows :

"I have known McIver since he was nine or ten years old. In October last I moved to where I now live. One evening in that month I went home and found my wife in tears—"said she had been grossly insulted by McIver"

v 66—6

—without asking particulars I went to seek a weapon. Met McIver, called him aside, cursed and abused him, he stood trembling, and when train came along went away on it. When I returned home my wife gave me particulars—said "McIver had thrown her on the bed and attempted to violate her person and did not desist till she threatened to tell me, and she had torn his coat in the struggle." I sought to find him after this. My wife begged me "to have no difficulty with him." I wrote him if he did not leave town in twenty-four hours, would prosecute him—he refused to go. I met him twice after this (but was unarmed both times) once at post-office and once at Madden's store.

On 10th of December I received a printed invitation to attend a ball to be given on evening of 11th, McIver's name was on the printed card with two others as a committee of invitation—one of them, Hazelhurst, was my wife's cousin. I went to see Hazelhurst to remonstrate with him about being in such company. I was very much excited—saw McIver standing with others at Nelson's store—walked up to him and said, "you infernal villain we have met at last," and fired on him, at my fourth shot he fell—between my third and fourth shot he got out his pistol but it went off in the air.

In rebuttal of this statement McIver, sworn, denied any attempted outrage on Mrs. Stewart, wife of accused, admits he had, at her request, waited on her to parties, dances, etc., and at her repeated invitations by note had visited her house. This, by *her* conduct and advances, had resulted in a criminal intimacy between them at divers times at her house—says he tried to stop it and she persisted—until at last he wrote her a note declining further to see her, and she wrote him threatening if he did not visit her she would expose everything to her husband. He believes her husband got hold of his note which caused the exposure and led to first interview spoken of by the accused between them. That in that

interview, when accused cursed him, he struck him in reply and made a motion as if to draw a pistol. That accused asked him to keep affair secret, and as the train came along on which he was employed, he got on it and went off. He says—saw accused at various times between that interview and 10th of December, when assault was made on him—never spoke to each other—saw him on the streets almost daily when he was at home—that he was wholly unprepared for the attack made on him. His age is nineteen and that of the wife of accused about thirty. The testimony of this witness, as to seeing and being seen by accused on the streets, was corroborated by another witness, and one witness testified as to taking a note from Mrs. Stewart to McIver while he, McIver, was on the train sometime before the shooting.

Such, in brief, is a summary of the material evidence submitted on the trial—upon which the jury, under the charge of the court, found the accused guilty, and on a motion being made for a new trial, which was refused by the court, we are called upon to review this judgment and to determine whether the same is correct.

The motion for a new trial embraces *nineteen* grounds of error. The first three are because, (1st.) the verdict is contrary to evidence; (2d.) is contrary to law—and (3d.) contrary to the principles of justice and equity. The next fifteen grounds are based upon alleged errors contained in the charge of the court—the incompetency certain jurors whose names did not appear on the jury list, and the last and nineteenth ground upon newly discovered testimony—discovered since, and not known to accused or his counsel at the trial.

1. We do not deem it necessary to discuss the three first grounds of this motion. That the act was committed by the accused is established beyond question and not contradicted by him in his statement but admitted, and whether it was justified under the circumstances, or mitigated and reduced to an offense of milder grade, was a

question the court left to the jury, and with their verdict
we find no cause of complaint under our view of the evidence.

2. The question also as to the competency of some
jurors who were on the trial of this cause, and whose
names were not selected by the jury commissioners, and
names not on the jury list, we regard the question as settled
by former decisions of this court against the plaintiff
in error.

3. There were three points made and mainly relied upon
in the argument before this court, to-wit: the eighth,
tenth and nineteenth grounds of the motion, which we
think it proper to notice—two of them as being alleged
errors in the charge of the court, and the last of newly
discovered testimony. The eighth was because the court
charged the jury, in connection with his charge relative to
the prisoner's statement, as follows:

"If you find it is not true, reject it. You do the same
by all evidence—but sworn testimony you have no right
*captiously* to reject unless impeached in some way."  . .

In the recent case of *Jones vs. State*, murder, from Richmond. not yet published, decided at the present term,
Judge Crawford, in delivering the opinion, says:

"Where a charge, though apparently improper when
abstracted from its context, when considered therewith is
legal and proper, it is not a ground for a new trial." *Jones
vs. State*, September term, 1880.

To read the charge complained of, abstracted from its
context, would seem to be error; but let us look to the
language of the charge given as to "the statement." Just
preceding the words complained of, the court says:

"If you find this *prima facia* case has been made out,
you will look to the testimony on the part of the defend-
ant and determine whether that case has been successfully
rebutted. For that purpose you can look to the "*state-
ment*" of the prisoner. You can look as well to the evi-
dence on the part of the state; if there is any testimony

that comes from the witnesses on the part of the state that serves to brace or corroborate "the statement" of the defendant, it is good for that purpose. In regarding the statement of the defendant, the law invests you with the right to give such credit to the statement of the prisoner as in your judgment its truth and its consistency entitles it to. To that end the law says that the prisoner's *statement can be taken* though it disregards the *sworn testimony* if its consistency and truth entitles it to take that position, or that you may believe part of the statements and reject part, or that you may reject it all. The law leaves you at your option to give at last to the *statement* of the *prisoner just that amount of weight* that you in your judgment think it entitled to, *trying it by the same rule* you try other evidence; you are seeking truth and if you find truth there embodied, give it its proper place in your investigation."

We cannot understand what more the accused could have sought from the court to give his "statement" all the dignity and weight of evidence in the language of the charge quoted above. He measures and weighs its credit by the same rule, and so repeatedly emphasizes the right of the jury to believe it. We cannot see what more the most astute counsel could have demanded. While therefore the words of the charge as "extracted" and set forth in the eighth ground of the motion, may bear the "semblance of error," when read in connection with the instructions of the court touching "the statement" immediately preceding, we cannot see how the jury could have been misled by the language complained of.

4. The tenth ground of the motion is in these words: "Because the court erred in his charge to the jury relative to the cooling time, because he said the law does not allow him time to seek opportunities, but the law presumes the irresistible burst of passion where a person is confronted with his enemy, or where he has repeated the indignity offered his family and it occurs from his first

meeting him." Without calling to the aid of this extract other portions of the instructions given, are not the legal propositions set forth the law of the case? Is it not true that the law does not justify or excuse one who "seeks opportunities" deliberately to take life, however gross the previous affront may have beeen? Is it not also true that the rule of accountability would be different if the attack was made on the "first meeting," or when he had repeated the indignity offered his family? when one would be presumed to act under the irresistible impulse of passion? Such is, in substance, the legal effect of the charge in the tenth ground of the motion, and we think, though expressed in the record (probably from copying) with some obscurity, yet they were distinctions the evidence fully justified the court in submitting to the jury for their guidance.

"To seek opportunies to take life" implies *thought* and *preparation* for the work, and is evidence of that "deliberate intent" that distinguishes the highest grade of homicide. But when one, outraged (as the accused claims to have been) by this gross wrong upon his wife according to his statement, "first meets" the wrong-doer—or if, even after the first meeting, the indignity is repeated, he at once assails this enemy to his peace—he would be presumed, as stated by the court, to be acting under the irresistible impulse of passion, and the grade of his offense would be materially changed if he would be guilty at all.

In this charge the court desires to impress upon the jury the distinction made by the law as to him who slays his adversary in the spirit of revenge, in satisfaction of a wrong committed at a distance of time when there was an opportunity for reason and humanity to interpose, and one who slays, impelled by that irresistible impulse, springing from the "first meeting," or a fresh repetition of the outrage. We think the distinction well settled and recognized by the law and the facts upon this trial, made it eminently proper to call the jury's attention to it.

Taking the whole charge as given, we are satisfied it was a fair, just and clear exposition of the law of the case, and we are of the opinion that the presiding judge extended to the accused every principle of law for his security that the evidence on the trial permitted, and after a close and careful examination of the alleged errors, based upon the instructions given, a majority of the court see no reason to withhold their approval of their correctness.

6. The last ground in this motion is based upon the ground of the newly discovered testimony as set forth in the affidavit of W. M. Berryman, who swears as to a conversation he had with the accused a few moments before the assault was made. We cannot see anything in this affidavit that goes to relieve this case of its prominent features as developed by the testimony. That is, that it is a case where the unfortunate accused sought to avenge a reputed gross wrong to his family after the knowledge of that fact had come to him more than two months from its occurrence—an assault which the law would characterize as being made in the spirit of revenge after a full opportunity for the voice of reason and humanity to have had its then legitimate influence upon his outraged feelings. Neither can we understand why what transpired between Berryman and the accused was not known to the latter before the trial. The communication was *between them* a few moments *before the firing*—accused was a party and cognizant of what then transpired touching the invitation, for he refers to it in his statement, and we cannot see why reasonable diligence might not have secured this testimony if it was deemed so important on the trial—and which was so promptly discovered (from the date of the record) when the issue proved unfavorable. Admitting the testimony to be true, we are not by any means satisfied that it would have resulted differently to the defendant had it been submitted to the jury, as the substance of it was contained in the statement of defendant and the testimony of other witnesses who were sworn.

While we are constrained from a sense of duty to re-fuse to interfere with the judgment of the court below, we cannot shut our eyes to the fact of the great outrage perpetrated, as detailed in this record, upon the peace and domestic happiness of the plaintiff in error by the man whose life he was accused of seeking to take.

If plaintiff's statement of the case be true, then McIver sought by force to violate the virtue of the wife who had treated him from boyhood with the kindness and confidence of a family connection.

If the sworn testimony of McIver be true, he was guilty of violating the marriage bed of plaintiff in error, and making his house "a bower of love," to use his own language, for the purpose of daily debauching the woman who had pledged plaintiff her fidelity at the altar.

It is not to be expected that men will submit uncomplainingly to such outrages be the one or the other true. But, when they become known to the aggrieved, and with a full knowledge of the wrongs perpetrated, if he waits day after day, week after week, and even for two months, and then meets his adversary, and without warning, opens an attack upon him with a weapon likely to produce death, shooting at him four times and striking him twice, inflicting dangerous wounds—the law cannot and will not justify such an attack made so evidently in the spirit of revenge, and with an intent to destroy the life of his adversary. Can a man be said to be justified under our law who, on being informed of such an outrage as he alleges was attempted on his wife, meets the assailant day by day on the streets, and after waiting two months from the time of information, suddenly assails him and shoots him down? We know of no case in any law book that approximates such a conclusion. We cannot conclude our view of this case more appropriately than by repeating what was said by one of the judges and the present Chief Justice of this court, when he engraved it upon our judicial records in the opinion pronounced in the case of *Hill vs. The State*, February term, 1880: "If men will take the law into

Stewart *vs.* The State.

their own hands—become themselves the judges of their own cases, and their own sheriff to execute the sentence they themselves pronounce, they must be certain they judge the case according to law and execute the sentence which that law pronounces, or suffer the consequences of their mistake of the law   Homicide for *past offenses*, however heinous, deliberately planned and premeditated and carried into execution, after reason has had time to assert her supremacy over passion, *is murder*, and he that judges in his own case that it is not, and executes sentence in such a case on a fellow-being, must suffer the penalty which the law imposes upon the murderer."

Judgment affirmed.

JACKSON, Chief Justice, concurring.

I yield a reluctant assent to the affirmance of the judgment refusing the grant of a new trial in this case.   The case is clearly distinguishable from *Hill vs. The State*, decided at the last term.   There, Mrs. Hill was introduced to the unfortunate man killed, as a common prostitute and among prostitutes ; she was neither assaulted with intent to ravish her nor was she seduced by Simmons ; she had fallen before he knew her, and the purity of her wifely life had been previously stained by illicit intercourse with others.   Of all this Hill had been informed, and but for an infatuation approaching lunacy, which afterwards consigned him to the asylum from the penitentiary, he must have believed it.   Yet, he took the law into his own hands, and months after the criminal intercourse of his wife with Simmons, after having repeatedly sought him armed for revenge, deliberately, and without warning, shot him down.   Simmons formed the acquaintance of Mrs. Hill, and had carnal knowledge of her, at public places of resort where lewd women congregated, and was wholly ignorant that she was a married woman until long after their intimacy had existed.

In the case at bar, McIver, being related to the family, had access to the hearthstone of Stewart, and there and there only deeply wronged him.   Not a breath of suspicion had soiled the purity of Mrs. Stewart before his assault upon her.   According to her statement to her husband, he attempted to use force upon her; according to his own, he consummated his villainy by seductive appliances used as much by her as by him.   He was either a ravenous beast of prey, determined to gloat his appetite on forbidden food, or a serpent coiling himself in a garden of peace and purity, and leaving the slime of his own corruption in the trail he left.   In either event the husband was innocent, and was more deeply wronged than it is possible otherwise to wrong a man, a neighbor and a relative.   McIver was warned to leave the city of Brunswick.   His own near relative offered to furnish the money to send him away; but he yielded to the advice of young men like himself, and imitated Solomon's son in scorning the counsel of gray hairs and sober minds.   The result was that, goaded to madness by the persistent and insulting presence of the man who had thus wronged him, Stewart shot him, and he narrowly escaped with life. Just before the rencontre, Stewart received an invitation to a ball, addressed to himself and ladies, signed by McIver, as one of the committee of invitation, and this seems to have been the hair that broke the camel's back.   On the spur of this insult, added to injury, the attack was made and the shot was fired.

Was he guilty of an assault with intent to murder? Would it have been murder had McIver fallen to rise no more?   Mark it.   The question is not was he justifiable, but was he guilty of assault with intent to murder, or of assault and battery?   Would the crime have been murder had McIver been slain, or would it have been voluntary manslaughter?   Perhaps, as my brethren and the court below all think, it would have been murder, but the margin is very narrow, and if passed at all it barely crossed the line.

If the act was done under an uncontrollable fit of passion immediately on the receipt of this last insult, and before reason became again enthroned, it would have been manslaughter; if from a spirit of revenge and with deliberate purpose to avenge himself previously entertained, and using this letter of invitation as a pretext or excuse to carry out a prior intention, then it would have been murder. I repeat, to my view, the line that separates the two crimes is very dimly defined under the facts which this record discloses—and I was myself much disposed, had there been any clear error of law, to grant the outraged husband another hearing. There are two inaccuracies in the charge of the court, which, had I sat here alone, I should have seized upon as sufficient to grant that re-hearing.

The one is the remark of the court immediately after the charge touching the prisoner's statement, which is, itself, clear and full, to this effect, "but sworn testimony you cannot captiously reject unless impeached," thereby possibly impressing the jury that they should give to sworn testimony greater weight than to the prisoner's statement, which is contrary to the tenor and spirit of the act of 1878. Perhaps, however, other portions of the charge may have remedied the effect of this remark and healed it, if it did not extract its sting.

The other is the charge which seemed to limit Stewart's defense to the first time he met McIver after his wife had made complaint to him. That this is the general rule, there can be no doubt, for "if uncontrollable rage" is to unbalance reason at all, it would be on the first sight of the ravisher or seducer, but in this case I doubt its application. Stewart did not wish to shoot McIver. He wished him to leave the community, and not stand there a constant reproach to his eyes and stench under his nostrils—and when first they met, McIver was about to leave on the cars, and did leave in a minute or two thereafter; and then Stewart had not heard from the lips

of his wife the entire affront.   Besides, it should be borne in mind that the immediate, proximate cause of the shooting was the renewal of the affront in the invitation to the ball, which makes this case not unlike the case of *Riggs vs. The State* in 29 *Ga.*, except that Mrs. Stewart was not present.

It is true in this, as in the other charge criticised above, there may be modifications in other parts thereof ; and the charge, as a whole, was evidently designed to be, and in the main is, a fair exposition of the law.

I remark further, that though the shooting occurred some weeks after Stewart got information of his first great wrong, McIver was much of the time absent from Brunswick, and was warned and urged to keep away.   And "the general countenance of the case," to use a striking expression of my late esteemed associate, Judge BLECK-LEY, is such that I should have been better pleased had my brethren agreed to have it again investigated.   Deference, however, to their judgment, and the deep consciousness that men are too apt to forget the injunctions of the Almighty, "vengeance is mine, I will repay, saith the Lord," and to take the redress of the wrongs done them out of the hands of the courts and avenge themselves, lead me to give a reluctant acquiescence to the judgment of affirmance.